THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ELEANOR R. MUNZER, Defendant-Appellant.

(No. 54789;

First District—April 13, 1971.

*Rehearing denied June 1, 1971.*

Sidney Z. Karasik, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Richard Pezzopane, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Eleanor R. Munzer, was convicted after a bench trial of the offense of battery as defined in Sec. 12—3 of the Criminal Code,* and sentenced to probation for one year. She appeals from the judgment and contends that the court erred in the admission and exclusion of certain evidence; that the court erred in disposing of her cross-complaint for battery; and that she was not proven guilty beyond a reasonable doubt.

Since the complaint and cross-complaint arose out of related incidents, the cases were called for trial together. The court proceeded to hear the complaint against the defendant brought by William Stephens, who was also defendant on the cross-complaint. Defendant Munzer is the divorced former wife of Robert Munzer. William Stephens is Robert Munzer's step-son who resided with him at 9430 Noel Street, Des Plaines, Illinois, where the altercation took place. *WILLIAM H. STEPHENS,* testified on behalf of the prosecution:

On September 23, 1969, at 9430 Noel, in Maine Township, he saw the defendant who he knew as his stepfather's former wife. It was approximately 4:30 P.M. and as he was walking across his front lawn, he observed the defendant walking across the lawn in the opposite direction toward the side door of his home. When he observed her, he turned and walked in the same direction as did defendant. He placed himself between defendant and the house. Defendant screamed profanities at him, as he proceeded to the driveway and up the steps to the main entrance

---

* Ill. Rev. Stat. 1969, ch. 38, par. 12—3 provides:
  "(a) A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual."

onto a small porch. He then placed himself between her and the door. He did not say anything to her, but she continued screaming profanities calling him a bastard. He did not respond. His mother came to the door and he instructed her to call the police. Defendant was still screaming and had her hand raised. In the hand she was holding a paper bag which measured about 8 x 10 inches. She then struck him with the bag, its contents and her hand on the left side of his head. The bag broke and a 6 or 7 inch kitchen knife fell out. He restrained her by grabbing her arms and pushing her away. The defendant fell off the step onto the ground and a gun fell out of the bag. Defendant picked up the gun and pointed it at him. He came off the stoop and took the gun away from her. It was a toy gun. He asked her to leave the premises, but she insisted that she wanted to see her daughter and she also said that she wanted to enter the house to ask about her oldest daughter. He took the gun from her by grabbing it. They both ended up on the ground. Defendant got up and proceeded to walk into the back yard and when she tried to get in the back door, he stepped in her way. At this time she struck him with her open hand. He did not strike her. She started walking back and he remained between her and the house.

There was no conversation. She wasn't making any sense. As they started to walk back to the side of the house, she picked up the knife that had fallen out of the bag and threw it into the main entrance of the house. She then proceeded to walk to the front of the house. As she walked toward her car, he kept himself between her and the house. She then entered her automobile and drove off.

His mother and a neighbor, Timothy Greenier, were at the scene during the altercation.

On cross-examination he testified that he considered defendant's conduct as threatening when he saw her approach the house. He did not know if his stepfather was behind in his alimony payments to the defendant. He felt that he was protecting the occupants of his home from violence and he was going to stop her. He would use force to accomplish it, just enough to keep her away from the house. At the time he became concerned about himself. When she fell, he did not help her arise.

*ARNOLD A. ROSEN*, testified on behalf of the prosecution:

He is an attorney. He represented Mr. Munzer in connection with certain post-decree divorce proceedings arising out of his divorce from defendant. An order had been previously entered by the Circuit Court, Divorce Division, restraining defendant from visiting Mr. Munzer's home.

On cross-examination he testified that the decree of divorce provided that Mr. Munzer pay alimony to the defendant, but that he had no knowledge of any default in payment.

*TIMOTHY GREENIER,* testified for the prosecution:

On the day of the altercation he was at Mr. Munzer's home and saw the defendant walking toward the side door of the house. He could not hear her, but could see she was speaking. Stephens was present with his back toward him and he saw the defendant strike Stephens with the paper bag as they reached the door. There was a commotion and defendant kept approaching the door. Stephens asked his mother to call the police. Defendant again struck Stephens ˙and she fell off the stoop. Stephens never struck the defendant. She was holding a gun and Stephens took it from her. Defendant then proceeded to the rear of the house. He came out of the house and heard the defendant yelling and screaming about seeing her daughter. Defendant again struck Stephens. Defendant continued screaming hysterically for a few minutes; then walked around to the side of the house, picked up the knife and threw it into the house.

On cross-examination he testified that he is a friend and classmate of Stephens and was visiting for the week. He observed Stephens restraining the defendant by grabbing her arms. Stephens did not push her down. She fell from the stoop.

*NANCY FLAIM,* testified for the prosecution that:

She is a next door neighbor and a friend who observed the altercation. She heard a disturbance and went outside. There she saw the defendant, whom she had never seen before, yelling and screaming hysterically. She did not see either the defendant or Stephens strike the other.

The defendant was screaming that she wanted to see her daughter and Stephens was standing in front of her with his arms out. They could not be seen when they went around to the side of the house. While defendant was departing, she was screaming all the time and yelled "I will be back."

*ELEANOR MUNZER,* testified on her own behalf as follows:

The visit was for the purpose of seeing her former husband to discuss past due alimony. She had spoken to him over the telephone an hour befor the ocurrence about past due alimony and the health, welfare and education of their daughter Joyce, who lives with her father. He swore at her and stated that it was none of her business. She replied that it was her business and that she would try to see him later. He hung up and she decided that it was time to talk to him in person. She had some gifts, a little toy for her daughter and two other gifts for her former hubsand's present wife. She drove over to her former husband's home and as she walked up the driveway, she saw Stephens come out of the house with a garden rake. He pretended he was working in the front yard. She continued to go to the front door to knock when Stephens followed her and said "Leave the premises." She told him that she did not come to visit

him but to see her former husband and that it was none of Stephen's concern. She tried to knock on the door, but Stephens stopped her by grabbing her right hand and knocking her down. He also grabbed the bag out of her hand.

Following the incident she went to Evanston Hospital. Dr. West took color photographs of her injuries with her camera which are true and accurate representations of the way she looked. (Defense then offered the photographs in evidence, but the State objected contending that proper foundation had not been laid. The court sustained the State's objection.)

She tried to rise after she had been pushed off the stoop. The door opened and she saw her daughter and her former husband's wife. The wife pulled her daughter into the house by the ear. As the defendant started to rise, Stephens grabbed the bag she had in her other hand. This bag contained two silver knives and a paring knife which were gifts for the present Mrs. Munzer and defendant's daughter. Stephens grabbed her by the arms and shoulders. She shoved and pushed her demanding that she leave the premises. She asked for the police to be called. She said, "Bill, please give this to your mother and the gun, the little toy cap gun, is for Joyce." Stephens refused to do it, but his mother did go into the house and call the police. She walked around to the rear of the house, but this was to ask Stephens to return the gifts to her. At no time did she ever offer violence toward Stephens or attempt to hit him. She never pointed the toy gun at Stephens. The gun was a toy for her daughter Joyce.

On cross-examination she testified that one hour prior to going over to his home, she had spoken to her former husband on the telephone. She went there to talk to him and to see her daughter, Joyce, who was 13. Joyce is living with her former husband and his wife. When she arrived, she was not sure he would be home, but she would have been willing to speak to his wife. She was advised that her former husband was not at home, at which time she stated that she had gifts for her daughter and her former husband's wife. She was struggling on the front porch with Stephens when she fell off backwards as a result of his pushing her. Up to the time he pushed her from the porch, she had never had physical contact with him. She was never near Stephens, but stated that he should stay away; that it was none of his business and that he was not to interfere with her, her former husband and his wife.

After hearing all the evidence the trial court sitting without jury found defendant guilty and sentenced her to one year's probation. The trial court discharged Stephens on the cross-complaint. Defendant appeals.

OPINION

Defendant initially contends that the trial court erred in permitting Arnold Rosen to testify for the State since he represented the complaining witness as counsel. Moreover, defendant contends that Rousen's testimony was irrelevant to the issues of the case.

■■ An attorney is not incompetent to testify in a case in which he is employed, but his testimony is to be given little weight. (*Wollschlaeger v. Mix* (1936), 364 Ill. 207; *Jonas v. Meyers* (1951), 410 Ill. 213.) While Rosen was not directly involved in the prime matter of the case as it pertained to the issue of defendant's guilt, he was indirectly interested, since a cross-complaint arising out of the same transaction had been filed against his client Stephens. The substance of Rosen's testimony was that he had represented Mr. Munzer in a previous action whereby an order had been issued against defendant restraining her from visiting Mr. Munzer's home.

■■ We find this testimony relevant in view of the fact that it tended to show defendant's state of mind and disposition at the time of the occurrence. Defendant was undoubtedly aware of the order restraining her from visiting Mr. Munzer's home. However, on the day in question, she violated the court order and precipitated a set of circumstances which the court had obviously sought to avoid. Therefore, the trial court did not err in allowing him to testify, nor in reviewing the record do we find an undue weight being assigned his testimony.

Defendant next contends that the trial court erred in excluding from evidence the photographs of her injuries, since proper foundation had been established. The State's objection to the photographs which was sustained by the trial court was that Dr. West, who had taken the photographs, was not in court.

■■ While photographic exhibits must be authenticated in order to establish sufficient foundation, such authentication is not restricted to the testimony of the photographer, but may be established through any party competent to testify as to their accuracy. (*Brennan v. Leshyn* (1964), 51 Ill.App.2d 132, 139.) Defendant was competent to establish the authenticity of the photographs since she was able to testify as to the fact that they correctly depicted her injuries. Therefore, we find that the photographs had been sufficiently authenticated.

However, while the trial court erred in excluding the photographs, we find no prejudice that would justify reversal. The trial court allowed the defendant to utilize the photographs in giving her direct testimony and the trial court was given the opportunity to view the photographs.

Defendant next contends that the evidence did not establish her guilt beyond a reasonable doubt. Moreover, defendant contends that the evi-

dence did establish that Stephens was the aggressor and that therefore, the trial court erred in finding her guilty and dismissing the cross-complaint against Stephens.

Where the evidence is merely conflicting, a reviewing court will not substitute its judgment for that of the trier of fact. (*People v. Clark* (1964), 30 Ill.2d 216.) There was sufficient credible evidence to establish defendant's acts as they pertained to the elements of the offense of battery. Most of Stephens' testimony was corroborated by Greenier and Flaim. The trial court properly concluded from the evidence that defendant was the aggressor and was guilty of the crime as charged.

Therefore, we affirm the judgment.

LEIGHTON, P. J., and McCORMICK, J., concur.